UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

AVEL IVANOVICH REVENKO,

                Petitioner,

    v.

PAMELA BONDI, *et al.*,

                Respondents.

CASE NO. 2:25-cv-00549-TL-GJL

REPORT AND RECOMMENDATION

Noting Date: August 12, 2025

Petitioner Avel Ivanovich Revenko is currently detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. Proceeding through counsel, Petitioner has filed a Petition for writ of habeas corpus under 28 U.S.C. § 2241 seeking release from custody. Dkts. 1, 6. Petitioner, who is a native and citizen of Moldova, asserts he is entitled to release because his detention by ICE has become indefinite within the meaning of *Zadvydas v. Davis*, 533 U.S. 678 (2001). *See* Dkt. 1 at 3.

The Government has filed a Return memorandum and Motion to Dismiss, which is currently ripe for review. Dkt. 9. Petitioner has filed a Response opposing the Government's

REPORT AND RECOMMENDATION - 1

Motion to Dismiss (Dkt. 12), and the Government has filed a Reply in support of its Motion (Dkt. 13).

The Court, having considered the parties' submissions and the governing law, concludes the Government's Motion to Dismiss (Dkt. 9) should be **GRANTED**, and Petitioner's federal habeas petition (Dkt. 1) and this action should be **DISMISSED**.

## I. BACKGROUND

Petitioner is a native and citizen of Moldova. Dkt. 10-1 at 2 (N. Bohl Dec.), Ex. A (Form I-213). Petitioner entered the United States as a refugee in April 1995. Dkt. 10-3 at 5, Ex. C (Notice to Appear). Petitioner's status was adjusted to lawful permanent resident ("LPR") in January 1997, retroactive to April 1995. *Id*.

Starting in 2007, Petitioner was arrested and convicted of a number of criminal offenses in Oregon and Washington. Dkt. 10-2 at 2–17, Ex. B (Pet.'s criminal history report). On September 23, 2007, Petitioner was arrested for driving under the influence ("DUI") in Washington County, Oregon. Dkt. 10-1 at 5, Ex. A; Dkt. 11 ¶ 5 (C. Hubbard Dec.). On August 28, 2008, Petitioner was convicted of that offense and sentenced to twenty days in jail and two years of probation. Dkt. 10-1 at 5, Ex. A; Dkt. 11 ¶ 5. On May 11, 2009, Petitioner was convicted of another DUI in Clark County, Washington, and sentenced to 365 days in jail. Dkt. 10-1 at 5, Ex. A. On October 31, 2011, Petitioner was convicted of Criminal Trespass-2 in Clark County and sentenced to 90 days in jail. Dkt. 10-1 at 5, Ex. A.

On August 7, 2017, Petitioner was convicted of a hit and run of an unattended vehicle and related offenses in Clark County, and sentenced to 314 days in jail. *Id*. On May 24, 2018, Petitioner was convicted of resisting arrest and sentenced to 90 days in jail. *Id*. On April 16,

1 | 2018, Petitioner was arrested again for DUI, convicted on July 23, 2018, and sentenced to 364
2 | days in jail. Dkt. 11 ¶ 5; Dkt. 10-1 at 5, Ex. A.

3 | On April 29, 2019, a domestic violence no-contact order was issued against Petitioner in
4 | Clark County. Dkt. 11 ¶ 6. On May 1, 2019, Petitioner was charged with residential burglary
5 | (domestic violence) and a violation of the domestic violence court order. *Id*. He pleaded guilty to
6 | the violation of the no-contact order, and on October 27, 2020, was sentenced to term of
7 | imprisonment of 364 days., deferred for 24 months. *Id*. On that same day, a jury found Petitioner
8 | guilty of the burglary charge and the judge sentenced him to twelve months in jail. *Id*. The judge
9 | also renewed the no-contact order for the victim until October 27, 2030. *Id*.

10 | As a result of Petitioner's multiple criminal convictions, ICE apprehended and detained
11 | Petitioner in April 2023. Dkt. 9 at 4. On April 11, 2023, U.S. Department of Homeland Security
12 | ("DHS") issued a Notice to Appear ("NTA") charging Petitioner as removable pursuant to INA §
13 | 237(a)(2)(E)(ii), for being a noncitizen who, any time after entry, has been enjoined under a
14 | protection order and has been determined to have engaged in conduct in violation of the order
15 | that involved protection against credible threats of violence, repeated harassment, or bodily
16 | injury to the person for whom the protection order was issued. Dkt. 11 ¶ 7.

17 | Petitioner was also charged as removable pursuant to INA § 237(a)(2)(A)(iii) (INA §
18 | 101(a)(43(G)) for being a noncitizen who, at any time after admission, was convicted of an
19 | aggravated felony relating to a theft offense or burglary offense for which at least a one-year
20 | term of imprisonment was imposed. *Id*. DHS subsequently filed the NTA with the Immigration
21 | Court in Tacoma, Washington, which initiated removal proceedings against Petitioner. *Id*.

22 | During Petitioner's removal proceedings, Petitioner was appointed counsel due to his
23 | mental competency issues. Dkt. 11 ¶ 9. An Immigration Judge ("IJ") held a bond hearing for
24 |

Petitioner and, on October 11, 2023, denied Petitioner's bond request based on a finding that Petitioner was a danger to the community and flight risk. *Id*. ¶ 8.

Subsequently, on November 17, 2023, the IJ found Petitioner removeable as charged, and ordered him removed to Russia, or Moldova in the alternative. *Id*.; Dkt. 10-4, Ex. D. Petitioner appealed the IJ's decision, and the Board of Immigration Appeals ("BIA") dismissed his appeal on May 16, 2024. Dkt. 11 ¶ 10; Dkt. 10-5, Ex. E. As such, Petitioner's removal became administratively final on May 16, 2024. Dkt. 11 ¶ 10; Dkt. 10-5, Ex. E. The Government thereafter had 90 days to effectuate Petitioner's removal. 8 U.S.C. § 1231(a)(1)(A).

ICE Deportation Officer Christopher Hubbard has submitted a declaration attesting, in part, to the efforts to obtain travel documents ("TD") to effectuate Petitioner's removal. Dkt. 11. On June 25, 2024, the ICE Office of Enforcement and Removal Operations ("ERO") attempted to contact Petitioner regarding his TD and custody status. *Id*. ¶ 11. Petitioner refused to meet with ERO due to, according to his qualified representative, his misunderstanding of his detention. *Id*.

On July 11, 2024, ERO met with Petitioner and his qualifying representative to gather information for Petitioner's TD and evaluate his custody status. *Id*. ¶ 12. Petitioner indicated he would live with his ex-wife if released; however, Petitioner's ex-wife is the person who has the no-contact order against Petitioner. *Id*.

On July 23, 2024, ERO completed Petitioner's Moldovan TD packet and submitted it to the Moldovan Embassy in Washington, D.C. *Id*. ¶ 13. While awaiting a decision, the ERO issued Petitioner its post-order custody decision determining that he should remain in custody due to being a danger to the community and flight risk. *Id*. ¶ 14.

REPORT AND RECOMMENDATION - 4

ERO contacted the Moldovan Embassy several times between September 2024 and December 2024 regarding Petitioner's TD. *Id*. ¶ 15. By December 10, 2024, the Moldovan Embassy indicated it could not issue an "emergency" TD for Petitioner. *Id*.

On March 5, 2025, ERO spoke with Petitioner's qualifying representative to determine whether Petitioner could be removed to another country. *Id*. ¶ 16. The qualifying representative suggested Russia, but at that time, it was determined that the Russian consulate would not issue Petitioner a TD. *Id*.

On March 6, 2025, ERO conducted a 180-day post-order custody review and decided to continue Petitioner's detention because he remained a threat to public safety, had a final order of removal, and the issuance of a TD to Moldova was pending. *Id*. ¶ 17. ERO served Petitioner with another notice to continue his detention on May 2, 2025, based on its decision that Petitioner still posed a danger to the public if released, and after finding Petitioner had been charged with assaulting staff, refusing orders, and insolence towards staff at the NWIPC on April 4, 2025. *Id*. ¶¶ 18, 20.

On May 1, 2025, ERO contacted ICE Headquarters Removal and International Operations ("HQ-RIO") for assistance in obtaining a TD for Petitioner to Moldova. *Id*. ¶ 19. On May 6, 2025, the Moldovan Consulate indicated it would issue a TD for Petitioner. *Id*. ¶ 21.

In a supplemental declaration submitted in this matter, ICE Deportation Officer Hubbard indicated that on May 23, 2025, and again on June 3, 2025, ERO contacted the Moldovan Consulate to obtain an update on the status of Petitioner's pending request for a TD. Dkt. 14 ¶ 1. The Moldovan Consulate confirmed receiving a copy of Petitioner's Moldovan birth certificate. *Id*.

1    On June 6, 2025, ERO arranged a phone call between the Moldovan Consulate and
2 Petitioner to discuss a TD. *Id*. ¶ 2. During that call, the Moldovan Consulate requested additional
3 identification documents for Petitioner from Washington or Oregon. *Id*. Officer Hubbard states
4 that ERO is working on obtaining those documents. *Id*. In addition, the Moldovan Consulate
5 requested a subsequent phone call with ERO and Petitioner on June 11, 2025. *Id*.

6    Finally, Officer Hubbard declared that, because Petitioner has been diagnosed with
7 psychiatric disorders and has a history of assaulting staff and being noncompliant at the NWIPC,
8 he has been placed in the segregation unit at the NWIPC. *Id*. ¶ 3. As a result, Petitioner's status
9 has "complicated arranging his removal." *Id*. However, "ERO remains confident that it will be
10 able to effectuate Petitioner's removal in the reasonably foreseeable future." *Id*.

11    Petitioner initiated the instant action on March 27, 2025. Dkt. 1. Petitioner alleges his
12 continued detention violates 8 U.S.C. § 1231(a)(6) and his due process rights. Dkt. 1 at 3.
13 Petitioner maintains that since his removal order became final on May 16, 2024, ICE has been
14 unable to effectuate his removal. *Id*. Petitioner asserts that, given the amount of time that has
15 passed since his removal order became final, approximately ten months at the time he filed his
16 Petition, there is no reasonable likelihood that his deportation will be effectuated in the
17 reasonably foreseeable future. *Id*. at 4. Petitioner requests that he be released from detention with
18 appropriate conditions. *Id*. at 6.

19    In its Return memorandum and Motion to Dismiss, the Government argues Petitioner's
20 detention is constitutional pending his removal, and requests the Petition be dismissed. Dkt. 9.
21 Petitioner opposes the Motion to Dismiss. Dkt. 12.
22 //
23
24

REPORT AND RECOMMENDATION - 6

## II. DISCUSSION

Title 8 U.S.C. § 1231 governs the detention and release of noncitizens such as Petitioner whose removal has been ordered. Under § 1231(a), DHS is required to detain a noncitizen during the 90-day "removal period." 8 U.S.C. §§ 1231(a)(2), (a)(1)(B). In this case, the removal period began on the date Petitioner's removal order became administratively final, May 16, 2024, and the removal period expired 90 days later on August 14, 2024. See 8 U.S.C. § 1231(a)(1)(B)(i).

After the removal period expires, DHS has the discretionary authority to continue to detain certain noncitizens, including those who are removable under § 1227(a)(2), or to release them on supervision. 8 U.S.C. § 1231(a)(6). Specifically, DHS may detain a noncitizen who has been determined "to be a risk to the community or unlikely to comply with the order of removal." *Id*. As noted above, ICE has determined that Petitioner poses a danger to public safety and presents a flight risk. *See* Dkt. 10-4, Ex. D; *see also* Dkt. 11 ¶¶ 8, 14, 17, 20. Because Petitioner is removable under § 1227(a)(2), his detention comports with the statute.

Although § 1231(a)(6) authorizes ICE to detain Petitioner, it cannot do so indefinitely. In *Zadvydas*, the Supreme Court held that § 1231(a)(6) implicitly limits a noncitizen's detention to a period reasonably necessary to bring about that individual's removal from the United States and does not permit "indefinite" detention. *Zadvydas*, 533 U.S. at 701. The Supreme Court determined that it is "presumptively reasonable" for DHS to detain a noncitizen for six months following entry of a final removal order while it works to remove the individual from the United States. *Id*. "After this 6-month period, once the [noncitizen] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id*. If the Government fails to rebut the noncitizen's showing, the noncitizen is entitled to habeas relief. *Id*.

The six-month presumption "does not mean that every [noncitizen] not removed must be released after six months. To the contrary, [a noncitizen] may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. Nevertheless, "for detention to remain reasonable, as the period of prior post removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id*.

Here, the presumptively reasonable six-month period expired on November 16, 2024, approximately eight months ago. In both his Petition and response to the Motion to Dismiss, Petitioner asserts there is no good reason to believe he will be removed to Moldova in the reasonably foreseeable future. *See* Dkt. 1 at 3; Dkt. 12 at 2–3. He claims that ICE knew at least four months ago that it could not remove Petitioner to either Moldova or Russia, yet still elected not to release Petitioner, as the law requires. Dkt. 12 at 2. In support, he attaches emails to immigration counsel indicating that, as of March 5, 2025, ICE was informed that Moldova and Russia refused to issue a TD to Petitioner. *See* Dkt. 12-1, Ex. 1. As such, Petitioner contends he should be released under appropriate conditions because "ICE has no current ability to deport [Petitioner]." Dkt. 12 at 2.

In its Motion to Dismiss, the Government contends that Petitioner's Petition is premised on an argument that Moldova refuses to issue a TD to Petitioner but, because those circumstances have changed, Petitioner now cannot show that his detention is indefinite. *See* Dkt. 9 at 7; *see also* Dkt. 13 at 2–3. Based on the record presented, the Court agrees.

Despite Petitioner's argument that, as of March 5, 2025, the Government could not show Petitioner would be removed to Moldova due to that country's refusal at the time to issue a TD, clearly ICE's more recent efforts demonstrate removal will occur in the reasonably foreseeable

future. Specifically, after HQ-RIO assisted ERO in its communication with Moldovan officials in May, 2025, on May 6, 2025, the Moldovan Consulate indicated, in fact, it *would issue* a TD for Petitioner. Dkt. 11 ¶¶ 19, 21.

Further, on May 23, 2025, and again on June 3, 2025, ERO contacted the Moldovan Consulate for the status of Petitioner's pending request for a TD. Dkt. 14 ¶ 1. The Moldovan Consulate confirmed receiving a copy of Petitioner's Moldovan birth certificate. *Id*. And on June 6, 2025, the Moldovan Consulate and Petitioner participated in a phone call to discuss a TD, at which time the consulate requested further documentation concerning Petitioner *Id*. ¶ 2. ERO is now seeking to acquire this documentation and a subsequent phone call with the parties was scheduled for June 11, 2025. *Id*.

Due to these more recent efforts on the part of the Government, Petitioner has not provided good reason to believe his removal is not significantly likely to occur in the reasonably foreseeable future. Although the Government has not identified a specific date by which it expects a TD to issue, the Ninth Circuit has held that uncertainty as to when removal will occur does not *per se* establish that detention is indefinite. *Diouf v. Mukasey* ("*Diouf I*"), 542 F.3d 1222, 1233 (9th Cir. 2008) ("That detention did not have a certain end date does not change the analysis."); *see also Zadvydas*, 533 U.S. at 702 (holding that the fact there was no "extant or pending" repatriation agreement with the country of removal was insufficient to establish detention was indefinite and remanding for the lower courts to also consider the likelihood that future negotiations would result in a repatriation agreement). The Ninth Circuit has explained that detention becomes indefinite only if, for example, the country designated in the removal order refuses to accept the noncitizen, or if removal is barred by the laws of this country. *Diouf I*, 542 F.3d at 1233. Neither situation exists in this case.

Therefore, this Court concludes that, though Petitioner has at this point been detained beyond the presumptively reasonable six-month period, it is significantly likely that Petitioner's removal will occur in the reasonably foreseeable future. Accordingly, Petitioner is not entitled to habeas relief.

### III.   CONCLUSION

Based on the foregoing, this Court recommends that the Government's Motion to Dismiss (Dkt. 9) be **GRANTED**, and that Petitioner's federal habeas Petition (Dkt. 1) and this action be **DISMISSED**. A proposed Order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, must be filed with the Clerk and served upon all parties not later than **fourteen (14) days** from the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar **fourteen (14) days** from the date they are filed. Responses to objections may be filed by **the day before the noting date**. If no timely objections are filed, the matter will be ready for consideration by the District Judge on August 12, 2025.

Dated this 22nd day of July, 2025.

Grady J. Leupold
United States Magistrate Judge

REPORT AND RECOMMENDATION - 10